IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


DAVID J. ROTH                                                        PLAINTIFF


        v.                              CIVIL NO. 10-3040


MICHAEL J. ASTRUE, Commissioner
Social Security Administration                               DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, David J. Roth, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for supplemental security income (SSI) benefits under the provisions of Title XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff protectively filed his current applications for SSI on November 19, 2007, alleging an inability to work since December 30, 1992, due to a broken knee, back pain, and depression. (Tr. 124-126). An administrative hearing was held on February 19, 2009, at which Plaintiff appeared with counsel and testified. (Tr. 18-70).

By written decision dated October 23, 2009, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 78). Specifically, the ALJ found Plaintiff had the following severe impairments: a fracture of left

patella, degenerative disc disease and a mood disorder.  However, after reviewing all of the evidence presented, he determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 78).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> lift and carry 20 pounds occasionally and 10 pounds frequently.  The claimant can sit for about 6 hours during an eight-hour workday and can stand and walk for about 6 hours during an eight-hour workday. The claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl.  The claimant would require a sit/stand option.  The claimant can perform unskilled work where interpersonal contact is incidental to the work performed.

(Tr. 79). With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a poultry deboner, a sorter, and an inspector.  (Tr. 83).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on March 17, 2010. (Tr. 1-4).  Subsequently, Plaintiff filed this action.  (Doc. 1).  Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation.  (Docs. 8,9).

## II.    Evidence Presented:

At the time of the administrative hearing before the ALJ on February 19, 2009, Plaintiff was forty-five years of age and testified that he obtained a general equivalency diploma. (Tr. 25). The record reflects Plaintiff's past work consists of work in construction.  (Tr.  191).

The medical evidence during the relevant time period reflects the following.  On November 4, 2007, Plaintiff entered the Baxter Regional Medical Center emergency room complaining of left leg pain after falling.  (Tr. 199-202).  Plaintiff reported he was unable to walk

AO72A
(Rev. 8/82)

without pain.  Plaintiff reported most of his pain was around his knee but he also had some left lower leg pain.  Plaintiff had no other complaints.  Upon examination, Dr. Philip Sadler noted Plaintiff's knee was swollen diffusely.  Dr. Sadler found effusion and noted significant patellar tenderness.  Dr. Sadler noted Plaintiff had good strength and range of motion with the exception of extension of the leg which Plaintiff was unable to do due to pain.  X-rays of Plaintiff's left knee revealed a transverse fracture of the patella. (Tr. 202).  Dr. Sadler diagnosed Plaintiff with a fractured left patella.  Dr. Sadler indicated that he planned to discuss Plaintiff with Dr. Green. Plaintiff indicated that he did not want to have surgery if at all possible.   Dr. Green recommended placing Plaintiff in a knee immobilizer and on crutches. Plaintiff was given an injection of Dilaudid and Percocet for pain. Plaintiff was instructed to place no weight on his left leg.

On November 8, 2007, Plaintiff was admitted into Baxter Regional Medical Center for outpatient surgery to repair a left patella fracture by Dr. Terry Glenn Green.  (Tr. 194-198, 225-238).   Prior to the surgery, Plaintiff denied experiencing headaches, weakness, paralysis, numbness, confusion, dizziness, seizures, depression, anxiety, insomnia or thoughts of suicide. Plaintiff reported he smoked one package of cigarettes a day.  After the procedure, Plaintiff was sent to recovery in stable condition without complications.

On November 20, 2007, Plaintiff returned to the Baxter Regional Orthopaedic Clinic for a follow-up for his left knee pain.  (Tr. 239-240).  Dr. Green noted that x-rays revealed what appeared to be secure tension band wiring on the left patellar fracture.  Plaintiff was to return in two weeks.

On December 3, 2007, Dr. Green examined Plaintiff and instructed him to increase

-3-

weight-bearing on the left knee.  (Tr. 241-242).  Dr. Green noted that x-rays of Plaintiff's knee revealed a patellar fracture still wired securely.  Dr. Green noted there was no displacement of the articular surface.  Plaintiff was to return in two weeks.

On December 17, 2007, Plaintiff returned to Dr. Green requesting medication. (Tr. 243-244).  Dr. Green noted x-rays revealed that everything was in good position. Dr. Green noted Plaintiff did not use a cane.  Plaintiff was to return in six weeks.

On January 9, 2008, Plaintiff reported that his left knee pain was a six out of ten.  (Tr. 245-246).  Plaintiff also requested more pain medication.  Dr. Green noted Plaintiff's range of motion had increased. Dr. Green noted that x-rays revealed a faintly visible fracture.  Plaintiff's Lortab prescription was refilled.  Plaintiff was to return in two months.

On January 16, 2008, Dr. Bill F. Payne, a non-examining medical consultant, completed a RFC assessment stating that Plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; and that postural, manipulative, visual, communicative or environmental limitations were not evident. (Tr. 217-224)**.**  Dr. Payne made the following additional comments:

> 44 y/o with noted hx of DDD of Lspine. 11/06 ER visit documents normal neuro exam. 11/07 ER visit for L patella fx and subsequently treated w/ORIF. CXR during hospital stay noted mild COPD changes, but nml respiratory exams (including pulse ox, lungs clear).  ROS notes no SOB.  Claimant reports no problems w/breathing.  MER supports a projected Medium RFC as of 11/08.

(Tr. 224).  After reviewing all the evidence, Dr. Jim Takach affirmed Dr. Payne's findings on March 27, 2008. (Tr. 254).  Dr. Takach had the following comments:

-4-

45 yo with a hx of uncomplicated LS DDD and mild COPD - ASX and 11/07 wiring of (L) patellar fx - no sequelae and healing well in early f/u- at recon: NO change in status therefore - after review of the MER in the file - the assessment of 1/16/2008 is affirmed for expected function after recovery as of 11/08.

(Tr. 254).

On March 5, 2008, Plaintiff underwent a diagnostic assessment at Ozark Counseling Services (OCS).  (Tr. 248-251).  Plaintiff reported that he did not feel like he belonged, that he had crying spells, that he had a low self worth and esteem, and that he felt hopeless. Plaintiff also reported excessive worrying.  Plaintiff reported in the past he had been incarcerated mostly for drugs.  With the exception of an occasional joint, Plaintiff denied drug use for the past five years. Plaintiff reported he had worked in construction but could no longer perform this job due to his back and knee pain.   Plaintiff was diagnosed with a dysthymic disorder and a history of polysubstance dependence and given a GAF score of 55.  It was recommended that Plaintiff receive out-patient supportive services.  The examiner indicated that no further evaluation was needed.

On March 10, 2008,[1] Plaintiff reported his knee pain was a five out of ten.  (Tr. 247). Plaintiff reported he was unable to sleep with his leg bent at night.  Plaintiff was concerned with the muscles in his left leg and the clicking in his knee.  Upon examination, Dr. Green noted Plaintiff could bend his knee fully but could not extend fully.  Dr. Green noted Plaintiff had a limping gait.  Plaintiff was to return in three to four months.

On March 31, 2008, Dr. Kay M. Gale, a non-examining medical consultant, completed a psychiatric review technique form indicating Plaintiff had mild restrictions of his activities of

---

[1]The Court notes that the year states 2007; however, this appears to be a typographical error.

daily living; mild difficulties in maintaining social functioning; moderate deficiencies of concentration persistence or pace; and had no episodes of decompensation. (Tr. 257-270). Dr. Gale's notes indicate the following:

> Claimant recently started mental health treatment. Initial diagnosis of dysthymic disorder is noted. History of substance abuse, reportedly in remission. Marked functional limitation is not documented. He seems capable of unskilled work.

(Tr. 269).

On the same date, Dr. Gale completed a mental RFC assessment stating Plaintiff had moderate limitations in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 271-274). Dr. Gale concluded that Plaintiff "is able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, with few variables, uses little judgement; supervision required is simple, direct and concrete. Unskilled work." (Tr. 273).

On May 1, 2008, Plaintiff underwent a neuropsychological evaluation performed by Dr. Vann Arthur Smith. (Tr. 276-279). Dr. Smith noted that medical records were being requested for review. Dr. Smith noted Plaintiff's memory was mildly impaired and his judgment and insight were grossly intact. Test results showed Plaintiff's Full Scale IQ was 98. After evaluating Plaintiff, Dr. Smith opined that Plaintiff's clinical history, mental status examination and neuropsychodiagnostic screening test profile revealed a pattern of abnormal findings consistent

-6-

with the diagnosis of a cognitive dysfunction, non-psychotic secondary to his general medical condition. Dr. Smith opined that Plaintiff was disabled.

Dr. Smith also completed a mental RFC questionnaire opining Plaintiff's current global assessment of functioning score was 40, and his highest was 70-75. (Tr. 280-284). Dr. Smith opined Plaintiff's prognosis was fair. Dr. Smith noted Plaintiff's signs and symptoms were as follows: psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities; easy distractibility; memory impairment-short, intermediate and long term; and sleep disturbance. Dr. Smith opined Plaintiff was seriously limited, but not precluded or unable to meet competitive standards in eighteen of twenty-five areas of functioning. Dr. Smith further opined Plaintiff would miss more than four days per month due to his impairments.

On June 8, 2008, Plaintiff returned to Dr. Green for a follow-up appointment. (Tr. 292). Dr. Green noted Plaintiff had quadriceps atrophy in the lower left extremity and was unable to do a straight leg raise. Plaintiff was also noted to have a limping gait and to take 4 Lortabs a day for pain. Dr. Green opined that Plaintiff could ride a bike, walk and run.

An OCS Individual Counseling Progress Note dated June 24, 2008, reported that Plaintiff had not had any negative thinking. (Tr. 303). Plaintiff reported that his roommate babysat two children and that he watched the children at the park for something fun to do. Plaintiff was encouraged to walk or swim and to play his guitar.

On July 2, 2008, Plaintiff underwent a psychiatric evaluation performed by Dr. Christopher Winslow. (Tr. 286-290). Plaintiff reported a long history of psychosocial

AO72A
(Rev. 8/82)

dysfunction, low mood, and poor self-esteem. Plaintiff reported that his symptoms of depression

began many years ago around the time of some heavy drug use in his 20s and 30s. Plaintiff

reported he had avoided most illicit drugs but on very rare occasion used cannabis. Plaintiff

reported he continued to drink heavily at times. Dr. Winslow noted Plaintiff's report that his

depression had been worsening for the last several months. Plaintiff reported that he had been

prompted to seek treatment because of this and because his girlfriend had good results with the

use of antidepressant medication. Plaintiff reported he had lost his drive to do anything.

Plaintiff reported he no longer showered daily and did not care about his appearance. Dr.

Winslow noted that Plaintiff admitted to some problems with anxiety in a roundabout fashion

but seemed to have difficulty identifying anxiety symptoms. Plaintiff reported he was easily

fatigued and had problems with occasional irritability. Dr. Winslow noted Plaintiff reported a

pattern of maintaining sobriety for two weeks to a month and then binged for two to three days.

After evaluating Plaintiff, Dr. Winslow diagnosed Plaintiff as follows:

| | |
|---|---|
| AXIS I: | 1. Major Depression, mild. |
| | 2. Dysthymia. |
| | 3. R/O Mood Disorder secondary to alcohol. |
| | 4. R/O Alcohol Withdrawal |
| | 5. R/O Generalized Anxiety Disorder. |
| | 6. Polysubstance Dependence, in partial sustained remission. |
| | 7. Cognitive Disorder NOS. |
| AXIS II: | Cluster B Features, R/O Antisocial Personality Disorder. |
| AXIS III: | Recent orthopedic surgery to left knee and chronic low back pain, history of head injuries. |
| AXIS IV: | Moderate with limited social support and financial limitations. |
| AXIS V: | GAF is approximately 49 at the present time and probably no higher than 55 in the past one year. |

(Tr. 289). Dr. Winslow recommended starting Plaintiff on medication for his depression and

advised Plaintiff to stop drinking. Dr. Winslow also recommended that Plaintiff go to the

Christian Clinic to have blood work performed.  Plaintiff was to return in three weeks or sooner if needed.

In a OCS Psychiatric Progress Note dated August 6, 2008, Dr. Winslow noted that Plaintiff reported that he was taking Lexapro and Neurontin.  Plaintiff reported the Neurontin was helping his nerve pain and the Lexapro was moderately helping his anxiety.  (Tr. 294-296).  Plaintiff reported he had also cut back on his drinking.  Plaintiff reported that he had knee and back pain. Plaintiff denied side effects caused by either the Lexapro or Neurontin.  Plaintiff reported his mood was better and that he had been socializing some.  Plaintiff's Neurontin was increased and his Lexapro was continued.  Plaintiff was to return in six to eight weeks.

An OCS Individual Counseling Progress Note dated August 26, 2008, reported Plaintiff was limping and complaining of sciatic pain.  (Tr. 301).  Plaintiff reported he could not see Dr. Green until the following week. Plaintiff reported he was out of pain medication and that his girlfriend had taken a handful of his muscle relaxants after he and she had been drinking.  Plaintiff reported that his depression was well controlled but that he continued to have leg pain.  Plaintiff reported he played catch with a boy, did household chores and tried skateboarding.  The counselor noted that Plaintiff reported that he was disabled and was trying to get disability but also reported working around the apartment, and mowing "a lot of grass" for his sister, who was a real estate agent.   The counselor opined that Plaintiff appeared to be hooked on pain medication.

On August 28, 2008, Plaintiff entered the Baxter Regional Medical Center emergency room complaining of back pain that radiated into his left leg.  (Tr. 305-309).  Dr. Janet B. Shapter noted Plaintiff was seen in the emergency room two days ago and was given three shots

for pain that Plaintiff reported worked through that day but re-occurred. Dr. Shapter noted Plaintiff had no problem ambulating and had actually ambulated all over the emergency department and out to the waiting room and back. Dr. Shapter noted Plaintiff did not appear to have any limitations in movement but had tenderness of the entire left back and leg to soft touch. Plaintiff was diagnosed with back pain radiating to the left leg. Plaintiff was instructed to keep his appointment with Dr. Green.

On September 3, 2008, Plaintiff returned to Dr. Green for follow-up care and complained that the wire in his knee had broken in half. (Tr. 299-300). Plaintiff reported that he needed pain medication to live a normal life. Plaintiff reported he had been in the emergency room twice because his limp threw out his back. Plaintiff wanted a refill for his pain medication. Upon examination, Dr. Green noted Plaintiff ambulated with a limp. Dr. Green noted there was no swelling or redness of the left knee. Dr. Green noted Plaintiff did not complain of numbness or tingling of the lower extremities. Dr. Green diagnosed Plaintiff with lower back pain and left knee pain. Plaintiff was referred to a Dr. Merheb.

In a letter dated September 3, 2008, Dr Green stated that he felt it would be better for Plaintiff to select another physician for medical care. (Tr. 298). Dr. Green strongly suggested that Plaintiff place himself under the care of another physician as soon as possible.

In an OCS Psychiatric Progress Note dated September 24, 2008, Dr. Winslow noted Plaintiff's report that his knee pain was persistent but not as sharp. (Tr 320-321). Plaintiff reported that his mood was also improving with the use of Lexapro. Plaintiff reported he felt more social. Plaintiff reported the pain around his knee was "achy" but very persistent and his sciatic pain was much less. Plaintiff reported his sleep was fair due to pain issues. Plaintiff

-10-

indicated he had not consumed alcohol in three weeks. Dr. Winslow informed Plaintiff that he could not treat Plaintiff's knee issues and that Plaintiff would need to follow up with a primary care physician. Dr. Winslow also informed Plaintiff about the Christian Clinic for further evaluation and noted that he might start Plaintiff on Cymbalta.

On October 21, 2008, Plaintiff called OCS and asked about trying Cymbalta. (Tr. 319). Plaintiff reported he had a friend that took this medication and had good results. Plaintiff also reported that the Lexapro had not been as effective for him. Dr. Winslow confirmed that he had discussed starting Plaintiff on Cymbalta at the previous office visit. Dr. Winslow gave Plaintiff instructions on stopping the Lexapro and starting the Cymbalta.

On November 3, 2008, Plaintiff called OCS and reported that he had tried the Cymbalta for a few days but decided to stop taking it because it made him feel "jittery." (Tr. 318). Plaintiff wanted to start taking the Lexapro again. Dr. Winslow stated Plaintiff would need to schedule an appointment but gave permission to give Plaintiff enough Lexapro to use until he was seen. An appointment was scheduled for December 10, 2008.

On December 2, 2008, Plaintiff called OCS to report that his sister would not be able to drive him to his appointment on December 10th. (Tr. 317). Dr. Winslow questioned whether Plaintiff could find another source of transportation as he needed to show up for the appointment.

On December 17, 2008, Plaintiff came to OCS for a medication check. (Tr. 316). The examiner noted Plaintiff was using a cane. The examiner also noted an underlying odor of alcohol and that Plaintiff was sucking on a peppermint. Plaintiff was also noted to be "persistently requesting another refill of Ultram." Plaintiff indicated that his Lexapro was not helping as well as before. Plaintiff reported that he was not as enthusiastic as he used to be.

-11-

Plaintiff admitted to occasionally using his girlfriend's hydrocodone for his back and knee pain. Per Dr. Winslow's orders, Plaintiff's Lexapro was increased and he was given a re-fill for Gabapentin. Dr. Winslow would not prescribe Ultram.

Medical records dated after the ALJ's decision consist of the following. On December 8, 2009, Plaintiff established care with Dr. Tammy Hale Tucker. (Tr. 326-330). Plaintiff complained of depression and wanted to obtain some medication. Plaintiff also complained of left knee pain, chronic back pain with neuropathy and chronic obstructive pulmonary disease. Plaintiff denied a history of substance abuse. Dr. Tucker noted Plaintiff walked with a cane. Dr. Tucker noted Plaintiff's range of motion of the cervical and lumbar spine and upper and lower extremities was full and his strength was 4/4 in all major muscle groups. Dr. Tucker assessed Plaintiff with depression, chronic obstructive pulmonary disease, knee pain, neuropathy of the lower extremities, back pain, osteoarthritis or spondylosis of the spine and degenerative joint disease. (Tr. 328). With regard to Plaintiff's chronic pain, Dr. Tucker noted she had obtained Plaintiff's old medical records; that she and Plaintiff had discussed and would sign a NWFC narcotic informed consent and contract; and that Plaintiff would need some lab tests performed. Dr. Tucker also replaced Plaintiff's Lexapro prescription with Welbutrin and Paxil. Plaintiff was to return in one month or sooner if needed.

**III.    Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be

-12-

affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past

-13-

relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. § 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § 416.920.

**IV.    Discussion:**

Plaintiff contends that the ALJ erred in concluding that the Plaintiff was not disabled. Defendant argues substantial evidence supports the ALJ's determination.

**A.    Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly evaluated Plaintiff's subjective complaints.  Although Plaintiff contends that his impairments were disabling, the evidence of record does not support this conclusion.

-14-

With regard to Plaintiff's alleged disabling knee impairment, the medical evidence revealed that Plaintiff underwent surgery to repair a fractured patella of the left knee in November of 2007. The treatment notes following this procedure reveal that while Plaintiff continued to complain of some pain, Dr. Green, his treating surgeon, indicated that Plaintiff's fracture was healing. By June of 2008, Dr. Green opined that Plaintiff could ride a bike, walk and run. In September of 2008, Plaintiff complained that the wire in his knee cap was broken in half and that his limp caused him to throw out his back. Plaintiff stated that he needed pain medication to live a normal life. Dr. Green noted Plaintiff ambulated with a limp but he found no swelling or redness to the left knee. Dr. Green also referred Plaintiff to Dr. Merheb. The record reveals that while Plaintiff did complain of pain of the knee when he was seen at OCS through December of 2008, there is no indication that Plaintiff sought treatment for knee pain again until December of 2009. It is also noteworthy that in August of 2008, Plaintiff reported to his OCS counselor that he was able to work around the apartment, mow "a lot of grass" for his sister, do household chores, play catch with a boy and that he tried skateboarding. During the relevant time period, Dr. Winslow also told Plaintiff on at least two occasions that he could seek treatment for his knee pain at the Christian Clinic. There is no evidence to show that Plaintiff followed Dr. Winslow's advice.

When discussing Plaintiff's knee impairment, the ALJ also addressed Plaintiff's use of a cane. Plaintiff testified at the February of 2009 administrative hearing that Dr. Merhab had prescribed the cane for him to use and that he had been using the cane for at least six months. (Tr. 25). Plaintiff explained that due to financial constraints he had not actually been treated by Dr. Merheb but that Dr. Merheb had given him the prescription for the cane and told him to

-15-

come in when he could. (Tr. 41).  The ALJ noted that the medical evidence revealed that in August of 2008, six months prior to the hearing, Dr. Shapter had noted that Plaintiff was ambulating without difficulty.  Based on the evidence of record, the Court finds substantial evidence to support the ALJ's determination that Plaintiff did not have a disabling knee impairment.

With regard to Plaintiff's back impairment, the record reveals that Plaintiff reported experiencing back pain when he went to OCS in March of 2008; however, in March and June of 2008, Plaintiff failed to report back pain to Dr. Green.  The record reveals that in August of 2008, Plaintiff was treated in the emergency room for back pain by Dr. Shapter.  At that time, Dr. Shapter noted Plaintiff had no problem ambulating and that Plaintiff had actually ambulated all over the emergency department.  Dr. Shapter noted that Plaintiff had tenderness of the entire left back and leg but that Plaintiff did not appear to have any limitations in movement.  Based on the evidence of record, the Court finds substantial evidence to support the ALJ's determination that Plaintiff did not have a disabling back impairment.

With regard to Plaintiff's alleged mental impairments, the record reveals that Plaintiff did seek treatment at OCS for depression and anxiety during the relevant time period.  A review of the OCS treatment notes indicated that Plaintiff reported experiencing a lot of benefit from medication.  Furthermore, at the administrative hearing, Plaintiff testified that the Lexapro had helped level out his emotional problems. (Tr. 44).  Impairments that are controllable or amenable to treatment do not support a finding of disability.  Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009).  Based on the record as a whole, the Court finds substantial evidence to support the ALJ's determination that Plaintiff did not have a disabling mental impairment.

-16-

Although Plaintiff contends that his failure to seek medical treatment is excused by his inability to afford treatment, Plaintiff has put forth no evidence to show that he sought low-cost medical treatment or was denied treatment due to his lack of funds. Murphy v. Sullivan, 953 F.3d 383, 386-87 (8th Cir. 1992) (holding that lack of evidence that plaintiff sought low-cost medical treatment from her doctor, clinics, or hospitals does not support plaintiff's contention of financial hardship).

Plaintiff's subjective complaints are also inconsistent with evidence regarding his daily activities. At the administrative hearing, Plaintiff testified that he was able to do some household chores for short periods of time; that he could dress and bathe himself; and that he could prepare his own meals. (Tr. 37, 46-47). The record also reveals that during the relevant time period, Plaintiff reported to his OCS counselor that he liked to go to the park and watch the children his roommate babysat; that he was mowing lawns for his sister; that he tried to skateboard; and that he played catch with a child. (Tr. 301, 303). Plaintiff also reported in a Function Report dated March 30, 2008, that he was able to shop for short periods of time. (Tr. 166). This level of activity belies Plaintiff's complaints of pain and limitation and the Eighth Circuit has consistently held that the ability to perform such activities contradicts a Plaintiff's subjective allegations of disabling pain. Cruze v. Chater, 85 F.3d 1320, 1324 (8th Cir.1996) (the ability to mow the lawn, car for animals, shop, do odd jobs and visit town tends to prove claimant was able to work).

With regard to the testimony of Plaintiff's mother and sister, the ALJ properly considered their testimony but found it unpersuasive. This determination was within the ALJ's province. See Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995); Ownbey v. Shalala, 5 F.3d 342, 345 (8th Cir. 1993).

-17-

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**B.      RFC Assessment:**

We next turn to the ALJ's assessment of Plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). However, "it is the ALJ's function to resolve conflicts among 'various treating and examining physicians.'" Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In finding Plaintiff able to perform light work with limitations, the ALJ considered Plaintiff's subjective complaints, the medical records of his treating and examining physicians, and the evaluations of non-examining medical examiners. Plaintiff contends the ALJ improperly disregarded Dr. Smith's opinion and did not properly address Dr. Winslow's treatment notes.

-18-

In deciding not to give controlling weight to Dr. Smith's opinion that Plaintiff was seriously limited, but not precluded or unable to meet competitive standards in eighteen of twenty-five areas of functioning and that Plaintiff was therefore disabled, the ALJ noted that Dr. Smith's findings were not consistent with the record as a whole.  Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)(the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).  With regard to Dr. Winslow's treatment notes, the record reflects that the OCS treatment notes indicate that Plaintiff responded well to medication.  The ALJ's RFC determination is further supported by the fact that even Plaintiff testified at the administrative hearing that his mental impairments had leveled off with the use of medication.  The record also shows that Plaintiff was able to participate in various activities including mowing lawns, playing catch, trying to skateboard, going to the park and performing tasks around the apartment during the relevant time period.  The record shows Plaintiff failed to seek any type of treatment from December 2008, through December of 2009, when he saw Dr. Tucker for the first time. After examining Plaintiff in December of 2009, Dr. Tucker did not place any restrictions on Plaintiff that would be in conflict with the ALJ's RFC determination.  Based on our above discussion of the medical evidence and Plaintiff's activities, the Court finds substantial evidence of record to support the ALJ's RFC assessment.

**C.    Hypothetical Question to the Vocational Expert:**

We now look to the ALJ's determination that Plaintiff could perform substantial gainful employment within the national economy. We find that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997);

-19-

Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996). Accordingly, we find that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff was not disabled as he was able to perform work as a poultry deboner, a sorter, and an inspector. See Pickney, 96 F.3d at 296 (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**IV.     Conclusion:**

Based on the foregoing, we recommend affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of July 2011.

/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-20-